## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                              |     |                                  |
|------------------------------|-----|----------------------------------|
|                              | *   |                                  |
| **PRADEEP SRIVASTAVA,**      | *   |                                  |
|                              | *   |                                  |
| Petitioner,                  | *   |                                  |
|                              | *   |                                  |
| v.                           | *   | Civil Action No.: RWT 11-2421    |
|                              | *   |                                  |
| **JOHN F. CARAWY**, *et al.*,| *   |                                  |
|                              | *   |                                  |
| Respondents.                 | *   |                                  |
|                              | *   |                                  |
|                              | *** |                                  |

## MEMORANDUM OPINION

In his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 Petitioner seeks immediate release from federal prison. Doc. No. 1. He claims that he is entitled to release because he allegedly has not been provided proper medical care for his Type I Diabetes Mellitus, contrary to representations made at sentencing regarding the level of care provided in the federal Bureau of Prisons ("BOP"). Petitioner later amended his petition to include a request for resentencing under 28 U.S.C. § 2255. Doc. No. 7. Respondents oppose the Petition and the Motion to Vacate on the grounds that the representations made regarding medical care were accurate and that the Court did not rely upon them in imposing a sentence that included incarceration. They also assert that the BOP is providing adequate medical care to Petitioner. Doc. No. 15. Respondents maintain that release from incarceration is not an appropriate remedy even if Petitioner's allegations regarding medical care were true. The court determines that a hearing in this matter is not necessary, the issues having been adequately briefed by the parties.

## I.      Background

On October 8, 2009, Petitioner[1] was convicted on two counts of willful income tax evasion and one count of filing a false income tax return.  On February 5, 2010, this Court sentenced Petitioner to serve 46 months imprisonment, and three years supervised release. Petitioner was also ordered to pay restitution in the amount of $16,110,160.00 as well as a special assessment of $300.  *United States v. Srivastava*, Crim. Case No. RWT-05-482 (D. Md.)

Petitioner alleges that at the January 27, 2010, sentencing hearing, this Court was provided with information regarding his medical condition, namely that he suffers from diabetes mellitus, Type I.  Petitioner expressed concern at the sentencing hearing regarding the BOP'S ability to provide him with adequate medical care for his condition and requested the court to exclude incarceration from his penalty so that he could continue to receive proper medical treatment.

The government opposed Petitioner's request for a sentence that did not include incarceration because it claimed he would receive proper care for his diabetes if he were incarcerated.  The government supported this assertion with materials allegedly demonstrating the BOP's ability to treat Petitioner's diabetes.  A letter dated January 21, 2010, from the BOP Regional Health Services Administrator Robert Ellis stated that the treatment regimen in place for diabetes mellitus, Type I includes: use of a continuous subcutaneous infusion pump and glucose monitoring system; personal insulin pumps used for newly incarcerated inmates; access to ultra-rapid acting insulin (Novolog); issuance of an individual glucometer with internal memory capability for monitoring purposes; coordination of insulin administration with food intake via assigned meal times and sack lunches or sacks; and regularly scheduled examinations

---

[1] Petitioner was a physician practicing as an internist and cardiologist prior to his incarceration.

with contracted optometrists and/or ophthalmologists. Doc. No. 7 at 3-4.   The government

further assured the court:

> We've submitted to [the Court] a lot of materials from BOP. And I
> think it is clear from those materials that in the BOP system, the
> defendant will receive adequate care for his diabetes. It is likely
> that he will be able to continue using his insulin pump; there's a
> significant likelihood he will be able to keep the same medication
> [he is currently on]. If not, BOP will provide appropriate
> medication based on a professionalized, individualized assessment
> of the defendant's condition.
>
>         ***
>
> And if you look [at] defendant's submission, they boil down to the
> claim that he can receive better care on the outside than he could in
> prison . . . . But I would submit Your Honor that the dictate of
> 3553 about providing treatment in the most effective manner
> possible simply does not mean that the  defendant should be
> permitted to receive that care in the comfort of his home. There is
> no question, I think, Your Honor that he will receive adequate care
> in the BOP facilities.
>
>         ***
>
> The bottom line is that BOP takes diabetes seriously and it will
> provide the defendant with adequate care, and his condition does
> not justify keeping him out of jail or a reduction of his sentence.

*Id.* (quoting Sentencing Hr'g Tr. at 71–73).

Petitioner asserts that this court relied upon the assurances made by the government when

it imposed a sentence of 46 months imprisonment inasmuch as this court concluded that "the

[BOP] is fully capable of providing medical care for a defendant with a diabetic condition of the

severity of this defendant."  *Id.* at 5 (quoting Sentencing Hr'g Tr. at 95).  In imposing sentence

this court also recommended that: defendant receive appropriate medical treatment for diabetes

mellitus, Type I and that the BOP provide the court with a report on the actions taken with regard

to that recommendation. *See United States v. Srivastava*, Crim. Case RWT-05-482 (D. Md.), Doc. No. 162.

Petitioner states that since being incarcerated in July of 2010, the BOP has failed to provide him with the medical care outlined in court.  Specifically, he claims he has not been issued a personal insulin pump, a glucometer, or ultra-rapid acting insulin.  Doc. No. 7 at 6.  He further claims there has been no coordination of insulin administration with food intake. Petitioner claims he does not receive insulin thirty minutes prior to each of his meals as required to maintain his condition. Petitioner states he has not been provided with sack lunches, snacks or rescue foods, nor does he receive a specialized diabetic diet, and he has not received an eye examination since being incarcerated. Petitioner also states he has not been provided with medication to treat his nephropathy, a condition involving his kidneys which can lead to kidney failure.  He claims that at sentencing the government stated that the BOP would provide appropriate medications and that there was a "significant likelihood" he would keep the same medications; however, the BOP has refused to provide Petitioner with Benicar, the medication he took prior to incarceration for his kidney condition.  *Id.* at 6–7.

Petitioner explains since July 2011, he receives insulin at 6:30 a.m. and 6:00 p.m.  His morning insulin is received after breakfast; he does not receive insulin before lunch; and he does not receive insulin before his 4:30 pm dinner.  Prior to July 2011, Petitioner alleges he received insulin only at 6:30 a.m. and 3:00 p.m., resulting in no insulin before breakfast or lunch and insulin 90 minutes prior to his 4:30 p.m. dinner.  Petitioner is also not receiving insulin at bed time needed to maintain blood sugar levels.  Petitioner claims that prison medical staff has admitted to him that they lack resources to provide insulin more than twice per day or within thirty minutes of scheduled meals.  *See, e.g.*, Doc. No. 7, Ex. 4.

As a result of the alleged failure to provide him with proper treatment for his diabetes, Petitioner claims that he has suffered numerous life-threatening medical issues in prison.  He claims in the 17 months he has been incarcerated he has fallen into a diabetic coma at least six times due to abnormally low blood sugar levels.  Four of those comas occurred in a single month, July 2011.  Doc. No. 1, Attach. 3 at 1-2; Doc. No. 7 at 7.  While confined at Butner, Petitioner alleges that he went into a diabetic coma, fell off his bunk, and suffered a severe head laceration as well as a concussion.  He states he now suffers from dizzy spells and back pain as a result of that incident.  Doc. No. 1 Attach. 4 at 3; Attach. 31; and Attach. 37.  Petitioner further alleges that his medical records establish he has had abnormally high blood sugar levels or low blood sugar levels throughout his incarceration as a result of the BOP's failure to provide him with the treatment required to manage his condition. *Id.*, Attach. 14–17, 25-29, 33. He states he has also suffered damage to his vision and is likely to experience kidney failure if he is not provided Benicar for his nephropathy. *Id.*, Attach. 3 at 3-4, 7.

Respondents have filed a Motion to Dismiss or for Summary Judgment.  Doc. No. 15. They state the care that has been provided to Petitioner during his confinement to the BOP comports with accepted medical practice and that some of the complications that have arisen in Petitioner's case are due to his non-compliance with daily doses of insulin as well as his failure to maintain a healthy diet and exercise program.  Respondents provide medical records and a declaration by Mohamed Moubarek, M.D., who is a physician at FCI-Cumberland ("Cumberland") where Petitioner is now confined.[2]  Dr. Moubarek outlines the medical care provided to Petitioner as well as the standards utilized in the BOP for the care and treatment of diabetic prisoners.  *Id.*

---

[2]   Petitioner was previously confined to FMC Butner based on this Court's recommendation to the BOP to send Petitioner to a medical center where his diabetes could be treated and, perhaps, Petitioner's skills as a physician could be utilized.  Doc. No. 15, Ex. 2 at  95-96.  Petitioner was transferred from Butner pursuant to his own request.

For diabetic inmates, the BOP recommends keeping blood sugar levels at less than 7Hb-A1c.   Doc. No. 15, Ex. 1, ¶ 5.   Dr. Moubarek states that a typical diabetic with perfectly controlled diabetes would have a blood sugar level no higher than 140 after ingesting food, and anywhere from 70-110 before ingesting food.   *Id.* ¶ 7.   He states, contrary to Petitioner's assertions, that there is no specific blood sugar number that correlates to hypoglycemia; rather, hypoglycemia is diagnosed primarily by symptoms correlated with a low blood glucose reading. *Id.* ¶ 7.   Factors which affect blood sugar levels include diet, exercise, genetic history, and the amount of artificial insulin consumed.   *Id.*  ¶ 8.

Two types of insulin are used in the BOP to treat diabetes: short-acting and long-acting. *Id.* ¶ 9.   Short-acting insulin is typically used before meals and long-acting is taken once or twice a day.   *Id.*   Dr. Moubarek states that in diabetics with difficult to control cases short-acting insulin should not be administered until after a blood sugar reading is performed with a glucometer.   *Id.*   Diabetic inmates at Cumberland have access to glucometers in the pill line or as needed if there is an emergency.   *Id.*   The health care provider responds appropriately based on the blood sugar level reading obtained.   *Id*.

Prescription medications available from BOP Health Services are formulary scheduled medications.   When inmates arrive in the BOP they are frequently provided with substitutions for those medications which were prescribed outside of the BOP.   Non-formulary medications are provided when an inmate's medical history demonstrates a specific reason that would necessitate the need for a certain medication.   The BOP attempts to prescribe medication to inmates that will be equally effective as those medications given prior to incarceration.   *Id*. ¶ 10.

On August 4, 2010, while at the Butner facility, Petitioner made a request to be switched to Lantus for insulin and Benicar (a non-formulary drug) for treatment of blood pressure and

microalbumin. *Id.* ¶ 13. Petitioner's treating physician, Dr. Nwude, informed Petitioner on August 5, 2010, that the request for Lantus was denied on July 29, 2010. *Id.* He further advised that the diabetes was well-controlled with NPH/Reg insulin as his blood sugar level taken on July 22, 2010 was HbA1C 7.1. *Id.* In addition, Petitioner was told his blood pressure was responding well to the Lisinopril he was taking; the last pressure reading was 113/67. Laboratory results from August 13, 2010, showed Petitioner's microalbumin levels were within normal limits (11 ug/ml). *Id.* On August 7, 2010, when Petitioner reported to pill line complaining of high blood sugar with a glucometer reading of 319, medical staff contacted the hospitalist and received a verbal order to give Petitioner seven units of a sliding scale dose of insulin. *Id.* ¶ 14.

On August 16, 2010, Petitioner complained to Health Services that he was suffering hypoglycemia, but he showed no signs or symptoms of distress as he was alert, and oriented to time place and person. *Id.* ¶ 16. Petitioner's blood sugar reading was 31 and he was given one glucose tablet and told to remain in Health Services to recheck his blood sugar in thirty minutes, at which time he reported no further problems. *Id.* After this incident a notation was made in his record to monitor his progress closely. Petitioner was also counseled on the importance and availability of rescue foods. *Id.* Additionally, it was noted that Petitioner had missed the evening insulin line, reporting at 10:30 p.m. to receive his insulin. He was reminded of the importance of complying with the insulin line. *Id.* ¶ 17.

Petitioner repeatedly requested to be placed on Lantus insulin while at Butner. *Id.* ¶ 22. The medication is non-formulary and was requested by medical staff at Petitioner's request. The request was denied twice due to Petitioner's failure to follow guidelines as well as a lack of evidence to support the need for a change. Medical staff assured Petitioner that when the

requirements for the change in medication were met, the request would be resubmitted. *Id*. ¶¶ 22 – 24.

On October 5, 2010, Petitioner was seen by an endocrinologist to review his diabetes treatment plan. *Id.* ¶ 25. The endocrinologist noted that Petitioner's diabetes was well controlled, but he had experienced episodes of hypoglycemia while on NPH insulin. *Id.* Pursuant to the endocrinologist's recommendation, another request for Lantus insulin was made in an effort to address the hypoglycemic episodes. *Id.* Four days later Petitioner was sent to Health Services on an emergency basis, complaining his blood sugar was low and that he had fallen from his bunk during a hypoglycemic episode. *Id.* ¶ 26. He required three sutures for a laceration sustained to the back of his head, was given oral glucose to raise his blood sugar levels, and was monitored for symptoms of dizziness and concussion. *Id.*

It is unclear when Petitioner was finally approved to receive Lantus insulin. Respondents' state the request was denied again on October 20, 2010, but on November 2, 2010, Petitioner agreed to switch from NPH insulin to Lantus insulin twice daily. *Id.* ¶ 30. Respondents further state he refused to give up his scheduled regular insulin shots and to keep only the Lantus with his sliding scale insulin therapy. *Id.* ¶¶ 31-32. On November 19, 2010, Petitioner requested that his morning dose of Lantus be adjusted to 35 units. *Id.* ¶ 31. He was described as agitated and consistently talking over health care staff. *Id.* Later, on December 17, 2010, Petitioner reported that his diabetes management was improved and he no longer required the use of sliding scale doses of insulin. *Id.* ¶ 32. No further complaints were registered at Butner regarding Petitioner's diabetes management.

Petitioner was transferred, at his request, to FCI Cumberland ("Cumberland") and was temporarily housed at the Federal Detention Center ("FDC") in Philadelphia, where he arrived

on April 7, 2011.   Medical records from FDC Philadelphia do not indicate that Petitioner experienced any problems related to his medical care while there.   *Id.* ¶¶ 34–35. Petitioner arrived at Cumberland on April 25, 2011.   *Id.* ¶ 36.   The following morning, when Petitioner reported to the morning pill line for Lantus insulin, it was not available.   *Id.* ¶ 38.   The pharmacy was notified to have it available at the evening pill line and Dr. Moubarek authorized three additional units of regular insulin.   *Id.*

On May 2, 2011, Petitioner reported to Health Services for chronic care and offered no complaints concerning his medications, but requested a personal glucometer.   *Id.* ¶ 39.   His request was denied and he was told he could check his glucose using a glucometer that is available during pill lines.   *Id.*   Petitioner's medications for anxiety, hypertension, and elevated cholesterol were renewed.   *Id.*   Later that month, on May 26, 2011, Petitioner reported irregularity in his glucose levels and renewed his request for a personal glucometer.[3]   *Id.* ¶ 41. Petitioner's insulin was adjusted to address the irregularities, but he was not provided a personal glucometer.   *Id.*

By June 16, 2011, Petitioner's blood glucose levels had improved, but his insulin was again adjusted on June 27, 2011, when an elevation in his blood glucose levels was noted.   *Id.* ¶¶ 44-45.   Petitioner experienced an episode of hypoglycemia which occurred at night and was reported by Petitioner to Health Services on July 28, 2011.   *Id.* ¶ 46.   His insulin orders were again adjusted, decreasing his evening dose of insulin.   *Id.*   During a follow-up appointment on August 9, 2011, Petitioner reported that since the change in the time of his evening insulin he had decreased the amount of Lantus insulin he took.   *Id.* ¶ 47.   Petitioner stated he did this in order to insure he would not have any hypoglycemic episodes in the middle of the night.   *Id.* Health Services staff noted that Petitioner was not experiencing episodes of hypoglycemia but

---

[3] Petitioner was issued a personal glucometer while he was confined at Butner.

had a demonstrated elevation in blood glucose levels.  Petitioner was told to attend the 10:45 a.m. pill line on a daily basis so he could have his blood glucose checked.  *Id.*

Petitioner's insulin was again changed at his request on August 15, 2011, when he asked that the standard amount of regular insulin be given twice a day as opposed to a sliding scale dose.  *Id.* ¶ 48.  The sliding scale insulin was discontinued and orders were written for 10 units of regular insulin twice a day with continued monitoring.  *Id.*  Petitioner was notified of a change in the time for blood glucose checks to 10:30 a.m. and he indicated his awareness of his need to attend.  *Id.* ¶ 49.

Petitioner received a vision screening test for diabetic retinopathy on August 30, 2011.  Because the screening was negative for retinopathy, Petitioner was scheduled for a one-year follow-up appointment.  *Id.* ¶ 50.

Petitioner again discussed a pattern of elevated blood glucose levels with Health Services staff on September 13, 2011.  *Id.* ¶ 51.  He admitted he was eating a snack in the evening because he did not want to experience low blood sugar levels at night.  *Id.*  The option of adjusting insulin dosage was rejected when Petitioner stated he would attempt to improve his blood sugar levels through adjusting his activity and diet.  *Id.*

Petitioner returned to Health Services on November 18, 2011, stating that he did not feel well.  *Id.* ¶ 51.  When checked his blood glucose level was 20, therefore, he was given a tube of glucose gel and kept in Health Services for observation.  *Id.*  He reported feeling better after eating a banana and, when checked again, his blood glucose was 80.  *Id.*  He was then released to eat lunch.  *Id.*  A few days later Petitioner reported having a hypoglycemic episode during the night when he reported to Health Services on November 21, 2011, for morning blood glucose check.  *Id.* ¶ 54.  Petitioner stated his belief that a recent increase in blood glucose levels were

attributable to changes in his diet as well an insufficient amount of exercise.  *Id.*  Again, adjustment to insulin levels was rejected in favor of a change in diet and exercise.  *Id.* ¶ 55. Petitioner again requested a personal glucometer which was again denied.  *Id.*  Later that day, a standing order was written for Petitioner allowing him a maximum of two glucose tubes for self-aid.  *Id.* ¶ 56.

Another incident occurred on November 26, 2011, when Petitioner was observed at the morning pill line appearing slightly confused and slow to answer questions.  *Id.* ¶ 56.  His blood glucose was measured at 21 and he was given a tube of glucose, held in Health Services, and, after ten minutes, his blood glucose was tested again, measuring 63.  *Id.*  After another ten minutes passed Petitioner's glucose level was measured again at 82, he was responding appropriately to questions, and stated he felt much better.  *Id.*  At that time Petitioner related he had only eaten a banana for dinner the night before.  *Id.*  Health Services staff withheld his regular insulin and gave him the Lantus insulin.  *Id.*  He was instructed to return if symptoms came back and  was then released to eat breakfast.  *Id.*

On December 21, 2011, Petitioner's morning blood glucose was tested at 32.  *Id.* ¶ 59. He told Health Services staff he had just eaten pancakes and wanted to take a few units of regular insulin despite the hypoglycemia.  *Id.*  Thirty minutes later his blood glucose was measured at 151.  *Id.*  Later that afternoon, Petitioner was seen on an emergent basis in Health Services after he was observed in the lunch line sweating, demonstrating sluggish behavior, and unable to respond correctly to questions.  *Id.* at 60.  When he arrived he was diaphoretic and slow to respond.  His blood glucose tested at 21, but with a combination of food and three glucose tablets it rose to 130 a short time later.  *Id.*  Petitioner then related that he had cut back on his food intake at breakfast because he had gained three pounds.  *Id.*  The following day he reported again

that he was eating half as much for breakfast as usual; therefore, his insulin orders were adjusted. *Id.* ¶ 61.

Respondents explain that the practice at the Cumberland facility is to have inmates test their blood sugar at Health Services where a nurse or other clinician provides a glucometer to the inmate when they report to the pill line. *Id.* ¶ 62. Once the results are obtained, staff is able to adjust the amount of insulin necessary based on pre-written orders and the results are recorded in the computerized medical record. *Id.* ¶¶ 62, 64. Petitioner is among the few diabetics who require three administrations of insulin per day; however, Respondents assert that he regularly fails to come to the third pill line for insulin.[4] With respect to Petitioner's prescription for Benicar, Respondents state it is a medication used to treat proteinuria (protein in the urine) and high blood pressure. *Id.* ¶ 68. Benicar is not a formulary medication within the BOP; therefore, Petitioner was switched to an ACE inhibitor which is regarded as the first line treatment for proteinuria. *Id.* ¶ 69. Respondents state, however, that they have no record of Petitioner ever being diagnosed with proteinuria. *Id.* ¶ 70. Respondents deny Petitioner's allegation that he has kidney damage or renal failure based on both his physical examinations and blood tests. *Id.*

Petitioner's two eye examinations in September 2010 and August 2011 indicated no significant retinopathy, contrary to his assertion that he is suffering proliferative retinopathy. The examinations did not indicate a need for further opthalmological consultation and, pursuant to BOP policy, Petitioner will continue to receive annual eye examinations. *Id.* ¶¶ 71-72.

Respondents further state that there is no evidence that Petitioner's diabetes cannot be controlled through injectable insulin rather than through a subcutaneous infusion insulin pump as

---

[4] Respondents state in particular that: "In September 2011, he was only 87% compliant in getting his third dose of insulin. In October 2011, he was only 5% compliant in getting his third dose of insulin. In November 2011, he was only 18% compliant in taking his third dose of insulin. In December 2011, he was only 72% compliant in taking his third dose of insulin." Doc. No. 15, Ex. 1 ¶ 63.

he used before his incarceration.  Additionally, they assert there is no medical reason for Petitioner to have his own glucometer when his blood sugar is tested at every pill line and the results are tracked by Health Services staff.  *Id.* ¶ 74.  Petitioner also does not demonstrate a need for ultra-rapid acting insulin, but if it were determined that it was medically warranted a request would be placed with the Central Office for review and approval.  *Id.* ¶¶ 74–76.

## II.    Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis omitted).  The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist.  *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in [his] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002) (citation omitted).  The court must, however, also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Smith v. Ozmint*, 578 F. 3d 246, 254 (4th Cir. 2009).

## III.    Analysis

### A.  Request for Resentencing Based on Material Misrepresentations

Petitioner claims that this Court was (1) misled by the BOP at the sentencing hearing with respect to the medical care that would be available to him if he was sentenced to a term of incarceration and (2) relied on that misinformation in deciding to send Petitioner to prison as opposed to home detention or probation.  Petitioner's assertions are not supported by the record. While the court acknowledged the seriousness of Petitioner's medical condition, it also recognized that it was not an "extraordinary impairment" warranting a downward departure in the sentencing guidelines.  Doc. No. 15, Ex. 2 at 88–89 ("[W]ith the appropriate medication and treatment regime that he's been utilizing, he is able to function, albeit with some degree of stress I'm sure. But he is able to live a close to normal life and practice his chosen profession and participate as a member of his family. So, I don't consider that this is a seriously infirmed defendant for whom there would be a basis for a departure under Section 5(H)1.4 of the guidelines.").  Other bases for downward departure advanced by the defendant included adverse

impact on family, his medical practice, and his patients, all of which were rejected by this court.

*Id*. at 89.  ("There is virtually no defendant with family who goes to prison that's not going to have significant adverse consequences befalling the family members because of the absence of the breadwinner or other member of the family to whom the dependents look for guidance and support and will not be receiving it.").

As this Court observed in deciding to impose a term of incarceration:

> It is an extremely serious offense. It is an offense which strikes at the heart of the government in being able to carry out its operations, and it is not to be trifled with that somebody could do that . . . for three years of deception and fraud, the  . . . first two of which were the most serious ones and result in the government not receiving over $16 million that it should have received.
>
> * * * *
>
> I recognize that matters have been brought to my attention about his medical condition and his family ties, his practice and his patients. But just as these are not sufficient for a downward departure, I consider them really to be the tragic consequences of the criminal conduct of the defendant and ones that would not justify a substantial downward variance in this case.

*Id*. at 92, 99.  Thus, Petitioner's assertions that "but for" the alleged misinformation provided regarding available medical care, this court would not have imposed a term of incarceration is simply incorrect. As the court observed, "I consider though that the deterrence factor is a *very significant factor* in arguing in favor of a sentence of incarceration." *Id*. at 95 (emphasis added). To the extent that the "available" medical care as outlined to the court by the BOP has not matched the care Petitioner was actually provided, the record in this case indicates that decisions regarding Petitioner's care are being made based on his current physical condition and symptoms.  Petitioner is not, however, entitled to dictate to Health Services staff the care he should or should not receive, and he is not entitled to the same care he received prior to his

incarceration. *See United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (prisoner not entitled to demand that pre-imprisonment medical care override reasonable professional judgment of prison's medical team.).  Like the impact on other aspects of his life, Petitioner's criminal conduct has had the consequence of requiring him to acclimate to a new health care system.

In an effort to insure his needs were more readily addressed, this court recommended that Petitioner be confined to a medical facility such as Butner.  Doc. No. 15, Ex. 2 at 95 ("I do believe that for two reasons that I'll address in a moment that the best setting for him to get that kind of a treatment is in a medical facility of the [BOP], and therefore I will be recommending a sentence that provides for him to be incarcerated at a medical facility of the [BOP].").   Indeed while at Butner, Petitioner had a personal glucometer that he now complains he does not have at Cumberland; yet he requested the transfer.   While there is evidence that the continuity in Petitioner's care was interrupted by his transfer, that interruption is not an unexpected or illegal consequence of the transfer.   Petitioner relies heavily on the representations made by the BOP concerning medical care but ignores completely the part of those representations regarding the preferred facility.   Instead, Petitioner asserts it was his right to transfer to Cumberland. Doc. No. 28 at 5.   Clearly, some of the changes in his care are due to his decision to transfer from a medical facility.

Petitioner's claim is similar to the claim asserted in *Popeck v. United States*, 2011 WL 3512000 (D. Md. 2011), where this Court held that a due process claim asserting that the court had sentenced Popeck based on a material misrepresentation regarding the available mental health care in the BOP failed, both because Popeck had failed to establish actual prejudice resulting from the alleged error and because her claim exceeded the parameters of relief available

under 28 U.S.C. §2255.  *Id.* at *2.  This court observed: "Relief under §2255 is limited to those situations in which a petitioner alleges a constitutional or jurisdictional error, or in which the court makes an error that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'"  *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).  As in *Popeck*, even if this Court had intended that Petitioner would receive the same medical care he received prior to incarceration, which it did not, the frustration of the subjective intention is not a fundamental defect in the sentence.  "There is no basis for enlarging the grounds for collateral attack to include claims based not on any objectively ascertainable error but on the frustration of the subjective intent of the sentencing judge."  *United States v. Addonizio*, 442 U.S. 178, 187 (1979).

### B.  Request for Resentencing Based on Constitutional Violations

The second element of Petitioner's claim is that the current conditions under which he is confined violate his constitutional rights and, therefore, he should be re-sentenced or released. This is a challenge to the manner in which his sentence is being executed by the BOP and is reviewable under 28 U.S.C. § 2241. *See* 28 U.S.C. § 2241(a).  The relief sought by Petitioner, release from prison, is not available.  "If an inmate established that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option." *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005).  Although this Court's intent was to punish Petitioner for his criminal conduct, inflicting him with irreversible consequences of poorly managed diabetes was not part of the punishment contemplated.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment claim for denial of medical care, an inmate must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the inmate was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).   Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).   "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Ctr.*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer*, 511 U.S. at 844.   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted."  *See Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in

light of the risk the defendant actually knew at the time.  *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000).

Respondents assert that Petitioner has failed to exhaust administrative remedies with respect to his Eighth Amendment claim.  Doc. Nos. 15, 27.  Petitioner does not deny that he did not complete the administrative remedy process, but seeks to be excused from doing so because the portion of the process he did complete placed the appropriate parties on notice and the exhaustion requirement is simply a delay tactic used to deny inmates vital medical care.  Doc. No. 23 at 7.

Petitioner is required to exhaust administrative remedies under 42 U.S.C. §1997e which provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

As a prisoner, Petitioner is subject to the strict requirements of the exhaustion provisions. It is of no consequence that Petitioner is aggrieved by a single occurrence, as opposed to a general condition of confinement claim.  *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (maintaining that no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  A claim which has not been exhausted may not be considered by this court.  *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the

action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond.

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008) (citations and quotation omitted).

Petitioner's Eighth Amendment claim must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that Respondents have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003). The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)

(finding that a prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Petitioner asserts that he filed an administrative remedy on January 5, 2012, with the warden of the Cumberland facility.  Doc. No. 28 at 8; *id*., Ex. 2-Y.  He states he appealed to the Regional Office but his appeal was denied as being untimely.  *Id*.  He claims his appeal was untimely due to circumstances beyond his control and an attempt was made on his behalf to have his appeal considered despite the failure to comply with filing deadlines.  *Id*.  Specifically, his Unit Case Manager, Mr. Easton, wrote to the Regional Office and explained "inmate Srivastava was ill informed of the time frame in which to appeal and . . .  he had no access to a copy machine as it was not functioning and in need of repair."  *Id*.   Mr. Easton then asked the Regional Office to reconsider Petitioner's request, but the Regional Office declined to do so.  *Id*. Based on this evidence, the Court concludes that Petitioner made a reasonable attempt to exhaust administrative remedies but for reasons beyond his ability to control he could not complete the process.  Accordingly, the court finds that the administrative remedy process was unavailable for purposes of exhausting the Eighth Amendment claim.

It is not disputed that Petitioner suffers from an objectively serious medical condition which, if not managed properly, could lead to serious, irreparable harm or death.  Respondents admit Petitioner's diabetes requires three daily doses of insulin.  Doc. No. 15, Ex. 2 ¶ 63. Petitioner asserts that he has only been authorized to receive two insulin doses per day.  Doc. No. 23 at 3-4.  Respondents allege that Petitioner simply has not complied with receiving the third dose of insulin.  The medical records submitted by Respondents appear to indicate that at one time Petitioner was prescribed three doses of insulin, but that prescription was discontinued on May 26, 2011, and he was prescribed two doses of insulin per day.  Doc. No. 15, Ex 1 Attach. A

at 249-50, 257, 280.  When viewing the evidence in a light most favorable to the Petitioner, his medical records suggest that he may not be receiving a third treatment of insulin as needed.[5] This error must be rectified.  Respondents will be required to inform the court of all measures taken to insure proper medical orders are entered to allow Petitioner to receive three daily doses of insulin.

The record also indicates that Petitioner has suffered what he characterizes as "wildly fluctuating blood sugar levels" during the period of his incarceration.  Doc. No. 23 at 4. Although Respondents describe reasonable medical care provided during Petitioner's critical episodes which pass constitutional muster, the question remains whether these episodes are a result of the medical care Petitioner is receiving or Petitioner's inability to properly manage and control his diet and medicine.  In either event, it is clear to this Court that at least some of the suffering Petitioner claims to have experienced was avoidable.  It is undisputed that Petitioner's disease was well controlled prior to his incarceration.  He maintains that his ability to coordinate exercise and meals with blood sugar levels throughout the day is compromised because he has access to a glucometer only three times per day.  Respondents have not offered any medical or security reason why Petitioner is not provided with his own glucometer at the Cumberland facility, and the parties do not dispute that he was provided with one while at Butner. Respondents' assertions that Petitioner's hypoglycemic episodes are the result of his improper diet or improper amount of exercise, when read in light of Petitioner's allegations, actually support Petitioner's assertion that a personal glucometer would improve his ability to manage his disease.  The undisputed facts therefore support a finding that Petitioner would suffer fewer episodes of blood sugar fluctuations if he were provided his own glucometer.  Respondents shall

---

[5] Whether the Petitioner is not being given his third dose of insulin or if he is failing to take his third dose of insulin is a material fact in dispute.

be required to inform this court the measures taken to provide Petitioner with a personal glucometer.

Petitioner's other allegations regarding prescription medication he was taking prior to incarceration which have not been provided (Benicar) and the failure to provide what he views as an adequate eye exam to screen for diabetic retinopathy are adequately refuted by the record evidence in this case.  Respondents have provided for a yearly screening of Petitioner's vision and have provided medication to address his blood pressure issue.  Petitioner's disagreement with the care provided is an insufficient basis for a finding of an Eighth Amendment violation.

## IV.    Conclusion

Petitioner's Motion to Vacate pursuant to 28 U.S.C. §2255 must be denied as the relief requested is not available.  The Petition for Writ of Habeas Corpus challenging the manner in which Petitioner's sentence is executed shall be granted in part and denied in part.  The court will order the BOP to provide the care medical staff admit is required by Petitioner's condition (three doses of daily insulin); to provide Petitioner with the tools needed to avoid further hypoglycemic episodes (glucometer); and to report to this court all measures taken to implement these changes in Petitioner's care to eliminate the constitutionally infirm aspects of his sentence.  A separate Order follows.

Date: June 19, 2012                                    _____/s/_____
                                                                       ROGER W. TITUS
                                                          UNITED STATES DISTRICT JUDGE